**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; and CHARLES A. WHOBREY, | ) ) ) | |
| | ) | |
| Plaintiffs/Counter-defendants, | ) | |
| | ) | No. 21 C 3684 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| WINGRA REDI-MIX, INC., a Wisconsin corporation; WINGRA STONE COMPANY, a Wisconsin corporation, and SUNDBY SAND AND GRAVEL CO., INC., a Wisconsin corporation, | ) ) ) ) ) | |
| | ) | |
| Defendants/Counter-plaintiffs. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Wingra Redi-Mix, Inc., Wingra Stone Co., and Sundby Sand & Gravel Co., Inc. (collectively, "Wingra") provide construction aggregates and redi-mix concrete. For over thirty years, Wingra has participated in the Central States, Southeast and Southwest Areas Pension Fund ("Central States" or "the pension fund"), a multiemployer pension fund plan. After the Great Recession in 2008, Wingra's business began to suffer, and a dispute arose between the company and the pension plan. As a result, the two parties entered into the 2017 Settlement Agreement resolving the issues. One provision of the agreement imposed hefty financial liability on Wingra if the company withdrew from the plan before January 1, 2021. From 2017 to 2020, Central States became concerned with Wingra's participation in the plan and decided to expel the company, effective November 1, 2020, two months before the critical date. Central States then sued Wingra, seeking $58 million in withdrawal liability because the company was no longer part of the fund. (Dkt. 29). Wingra answered, raised affirmative defenses, and counterclaimed for a breach of the

Settlement Agreement. (Dkt. 30). Wingra now moves to compel discovery from Central States. For the following reasons, the Court grants Wingra's motion. (Dkt. 44).

## BACKGROUND

Wingra, a business that provides construction aggregates and redi-mix concrete, maintained collective bargaining agreements with certain employees and participated in the Central States pension fund, a multiemployer pension fund, for over thirty years. (Dkt. 45 at 2). Throughout that period, a Trust Agreement governed the relationship between Wingra and the pension fund. (Dkt. 30 at ¶ 1). In 2016, a dispute arose over Wingra's required contributions to the fund and its employment of nonunion workers in violation of an adverse-selection rule. Wingra claimed that since 2008, the construction business slowed, leading to reduced revenue and, in turn, fewer dues-paying union members. (*Id.* ¶ 3). Wingra believed it should make lower contributions to account for the downturn in business; Central States asked that the amounts remain the same. (*Id.*) The two parties resolved the dispute in a 2017 settlement agreement. (*Id.* ¶ 5). The "key provision" of the deal locked Wingra into a "liability number." (*Id.* ¶ 6). If Wingra left the pension fund on or before December 31, 2020, it would potentially owe over $58 million. (*Id.* ¶ 7). A withdrawal after the date would lead to substantially less liability. (*Id.*)

In 2018 and 2019, Central States audited Wingra's pension-fund participation, (Dkt. 30 ¶ 25), claiming Wingra impermissibly transferred work to nonunion workers. (Dkt. 45 at 3). Wingra allegedly complied with the Settlement Agreement and any audit requests. (*Id.*) Central States, nonetheless, threatened to terminate Wingra from the pension plan and eventually did so on September 18, 2020, effective November 1, 2020, just two months before the critical date in the Settlement Agreement. (*Id.*; Dkt. 30 ¶ 10).

2

Central States sued Wingra to recover over $58 million. It alleges that Wingra caused the "2020 Withdrawal" and, as a result, must pay the liability along with other associated fees. (Dkt. 29 ¶ 29). Wingra answered the complaint, raised four defenses, and asserted a counterclaim; it seeks a declaration that Wingra never violated the Settlement Agreement; that Central States' decision to terminate Wingra's participation was arbitrary and capricious; that Wingra was an active fund member as of January 1, 2021; and that Central States is not entitled to damages under the Settlement Agreement. (Dkt. 30 ¶ 50). The parties began discovery, and the end of fact discovery was set for September 30, 2022. (Dkt. 39). During the process, a dispute arose over whether certain records are discoverable. Wingra seeks to compel Central States to produce records related to witness interviews or conversations related to Wingra from 2017 to 2020; internal emails and text messages related to Wingra from 2017 to 2020; communications from 2017 to 2020 with several parties; audit files of Wingra from 2017 to 2020; and a privilege log. (Dkt. 44).

## DISCUSSION

"[D]istrict courts enjoy extremely broad discretion in controlling discovery." *Jones v. City of Elkhart*, 737 F.3d 1107, 1115 (7th Cir. 2013). Nonprivileged information is discoverable if it is "relevant to any party's claim or defense and proportional to the needs of the case, considering . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). And "relevant" is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see also Akridge v. ALFA Mutual Ins. Co.*, 1 F.4th 1271, 1276 (11th Cir. 2021). Central States believes the discovery sought is not relevant for two reasons: first,

Wingra waived its defenses and counterclaims by not initiating arbitration; and second, the request extends beyond the "administrative record," the only record that can be considered by a reviewing court. The Court considers each in turn.

### I.     Mandatory Arbitration

Broadly speaking, two forms of private pensions exist: a traditional pension plan that covers workers from one employer, referred to as single-employer plans, where the employer contributes a certain amount of money for each worker; and a multiemployer pension plan that involves more than one employer, allowing an employee to gain credits toward pension benefits from multiple companies, often in the same industry.[1]

In 1974, Congress passed the seminal Employee Retirement Income Security Act ("ERISA") setting forth standards for private pension plans. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Six years later, the Multiemployer Pension Plan Amendments Act ("MPPAA") followed to "ensure that withdrawing employers would not leave a plan with vested pension obligations that were only partially funded." *Cent. States, Se. & Sw. Areas Pension Fund v. Bomar Nat'l, Inc.*, 253 F.3d 1011, 1014 (7th Cir. 2001). Under the MPPAA, the pension plan makes an initial determination of "whether a withdrawal has occurred" and what liability, if any, an employer owes. *Cent. States, Se. & Sw. Areas Pension Fund v. Cullum Cos.*, 973 F.2d 1333, 1335 (7th Cir. 1992). The pension plan then notices and demands payment from the employer. 29 U.S.C. §§ 1382, 1399(b)(1). "Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination [of withdrawal liability] made under sections 1381 through 1399 of this title [is] resolved through arbitration." *Id.* § 1401. If an employer fails to timely initiate arbitration, "the employer waives the right to contest the assessment and the amounts demanded

---

[1] Harriet Weinstein & William J. Wiatrowski, *Multiemployer Pension Plans*, Compensation and Working Conditions 19, 19 (1999), https://www.bls.gov/opub/mlr/cwc/multiemployer-pension-plans.pdf

by the plan become 'due and owing' and the plan can sue to collect it."[2] *Chi. Truck Drivers, Helpers & Warehouse Union (Independent) Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526, 529 (7th Cir. 1997). "Failure to initiate arbitration," therefore, "has a simple and adverse consequence—withdrawal is conclusively established." *Tsareff v. MannWebb Servs., Inc.*, 794 F.3d 841, 848 (7th Cir. 2015).

Central States believes that Wingra made a "complete withdrawal," as outlined in § 1383, from the pension plan.[3] *See Tsareff*, 794 F.3d at 848. Both sides acknowledge Wingra did not leave willingly—rather, Central States expelled the company. The question, then, is whether an expulsion constitutes a "complete withdrawal."

The text of the statute is the starting point. *Van Buren v. United States*, 141 S. Ct. 1648, 1654 (2021). Section 1383 states "[f]or purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer permanently ceases to have an obligation to contribute under the plan." 29 U.S.C. § 1383(a)(1); *see also* 29 U.S.C. § 1381(b)(2) ("The term 'complete withdrawal' means a complete withdrawal described in section 1383 of this title."). A court interpreting a statute must do so "in accord with the ordinary public meaning of its terms." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). "After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Id.* Additionally, dictionary definitions can aid courts in ascertaining the meaning of undefined words. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

---

[2] This case arises as a discovery dispute in part because when Central States filed its answer to the counterclaim, the clock had not yet run out on the mandatory-arbitration period. (Dkt. 58).

[3] This Court's opinion in *Central States, Southeast & Southwest Areas Pension Fund v. Rail Terminal Services, LLC*, No. 18 C 2372, 2019 WL 2326002 (N.D. Ill. May 31, 2019), involved a traditional fact pattern of an employer opting out of the fund. *See id.* at *2 ("Rail Terminal stopped making contributions to the Pension Fund after March 31, 2017.").

The operative word in § 1383 is "withdrawal." The ordinary meaning of the term conveys a person's voluntary act to discontinue an activity. Its definition is a "retreat or retirement" or a "removal from a place or position." *The American Heritage Dictionary* 1387 (1982); *see also The American Heritage Dictionary of the English Language* 1471 (1979) ("A retreat or retirement"). A "retreat" or "retirement," like a "withdrawal," imply conscious acts made by the actor. For instance, a retreating general gives the order, not the other way around. The opposing commander does not yell "retreat" to the other army and hope the troops go home. Similarly, a worker choosing to retire decides whether to leave employment. When an employer wishes an employee to exit without the person's consent, the company "fires" or "terminates" the employee. Rarely would an employer go to a poorly performing employee and say, "you're in retirement." The same logic applies to "withdrawal." The person engaging in the act of "withdrawing" is making the decision— not the opposing party. If someone wishes a person to "withdraw" from a situation, the person "expels" or "forces" the individual to leave.

Other dictionaries define the noun "withdrawal" in relation to the verb "withdraw," a definition that provides further support. "To withdraw" is "to draw back, away or aside." *The Random House Dictionary of the English Language* 1640 (1983); *see also Webster's New World Dictionary of the American Language* 1633 (1979) ("to take back or draw back; remove"). A person that "draw[s] back" consciously pulls away. As an example, "[s]he withdrew her hand from his," and "[h]e withdrew his savings from the bank." *Id.* Both individuals chose to "withdr[a]w." The impetus was solely theirs. They were the actors, the decision-makers, the ones in control. No one compelled them—indeed, no definition or ordinary use of the term "withdraw" involves a different person forcing a nonconsensual action.

Central States directs attention toward the latter part of the clause—that a withdrawal occurs when an employer "ceases to have an obligation to contribute." 29 U.S.C. § 1383(a)(1); *see also Cullum Cos.*, 973 F.2d at 1335 ("The pension plan has initial responsibility for determining whether a withdrawal has occurred and assessing withdrawal liability."). It reasons an expelled employer "ceases to have an obligation" because of the expulsion from the pension plan. But "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context …." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). The subject of the provision is a "complete withdrawal." The latter part of the clause simply establishes when a withdrawal is "complete." It does not, however, alter the traditional definition of "withdrawal." For further confirmation, a different provision of the MPPAA, § 1385, has an identical structure and defines "partial withdrawal" to mean a "70-percent contribution decline," with the clauses of each section modifying the adjective preceding "withdrawal," not the noun itself. 29 U.S.C. § 1385(a)(1).

Interpreting "withdrawal" to mean a voluntary act initiated by the employer accords with the MPPAA's purpose. Again, the law ensures employers do not "*leave* a plan with vested pension obligations that were only partially funded." *Bomar Nat'l, Inc.*, 253 F.3d at 1014 (emphasis added). The target, then, is misbehaving employers hoping to escape payments by removing themselves. Wingra and other similarly situated employers, however, do not wish to leave the plan. In fact, they want to remain and continue to fund their pension obligations. A contrary interpretation would enable pension funds to impose massive financial liability, then wait for the harsh rule of arbitration to end the lawsuit. While employers may try to stay in the plan to avoid withdrawal liability, the pension plan can collect any additional money owed. *See* 29 U.S.C. § 1451(a)(1) ("A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or

omission of any party under this subtitle with respect to a multiemployer plan … may bring an action for appropriate legal or equitable relief, or both.").

The main appellate case identified by the parties has little to say about the issue.[4] In *Borntrager v. Central States, Southeast & Southwest Areas Pension Fund*, the pension fund expelled the participant from the plan, which prompted the company to sue in district court. 425 F.3d 1087, 1088 (8th Cir. 2005). The fund moved to dismiss for lack of jurisdiction; the district court denied the motion and remanded the matter back to the fund for further development of the record.[5] *Id.* The fund appealed the ruling to the Eighth Circuit, arguing the court had jurisdiction for several reasons. *Id.* at 1090–91. The Eighth Circuit disagreed and dismissed for lack of jurisdiction without significantly remarking on mandatory arbitration. *See generally id.*

Lacking any controlling appellate authority, Central States turns to nonbinding district court opinions. But these cases are also unhelpful. The lawyer in one submitted a brief "largely devoid of any legal argument." *Cent. States, Se. & Sw. Areas Pension Fund v. Blue Sky Heavy Hauling, Inc.*, No. 10 C 2191, 2011 WL 1113396 at *3 (N.D. Ill. Mar. 23, 2011). "The attorneys [had] not identified any reasonable basis for continuing the litigation," and therefore, sanctions were appropriate. *Id.* at *5. The deficient performance leaves this Court with little confidence the issues were fully litigated—even assuming the opinion reached the opposite conclusion. *Fort Transfer Co., Inc. v. Central States, Southeast & Southwest Areas Pension Fund* "disagree[d] with the *Brontrager* court" because "[a]lthough the expulsion may not be a voluntary withdrawal from

---

[4] *Carl Colteryahn Dairy, Inc. v. Western Pa. Teamsters and Employers Pension*, 847 F.2d 113 (3d Cir. 1988), concerned fraud and misrepresentation claims, quite distinguishable from the issue before this Court. *See id.* at 118 ("[I]t is plain that the statute neither grants the MPPAA arbitrator such power nor, more importantly, deprives the federal courts of the power to decide such claims in the first instance.")

[5] Curiously, Central States advanced the opposite argument in those proceedings. As the district court summarized, "Central States points out that no section of ERISA regulates the expulsion of an employer from a pension plan." *Borntrager v. Cent. States, Se. & Sw. Areas Pension Fund*, No. C02-0139, 2003 WL 22251407 at *2 (N.D. Iowa July 2, 2003).

a pension fund, it is a withdrawal nonetheless." No. 06 C 3529, 2007 WL 707545 at *5 (N.D. Ill. Mar. 2, 2007). This cursory statement, though, lacks textual analysis and cannot carry the day for Central States.

*    *    *

So defined, § 1383 applies only when an employer decides to leave a pension plan, and therefore, an employer's expulsion falls outside the statute. Therefore, Wingra did not need to initiate arbitration within the prescribed statutory period.

## II.    Administrative Record

Given that Wingra lawfully pursued its claims in federal court, the Court turns to the discovery dispute itself. Here, the parties disagree about the framing. Wingra considers this dispute to be a straightforward contract case about the Settlement Agreement. Central States views the conflict as one over the administration of the pension fund and so must be limited to the administrative record already given to Wingra. The Court assumes the dispute concerns the pension fund's administration because even under this assumption, Wingra is entitled to the discovery sought.[6]

The operative Trust Agreement language, both parties acknowledge, affords the trustees "discretionary and final authority in making all [relevant] decisions." (Dkt. 53 at 8–9). The "discretionary and final authority" language "trigger[s] the arbitrary and capricious standard of review." *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 685–86 (7th Cir. 2004); *see also Dragus v. Reliance Standard Life Ins. Co.*, 882 F.3d 667, 671–72 (7th Cir. 2018). "Arbitrary and capricious" review is highly deferential. *Cerentano v. UMWA Health & Ret. Funds*, 735 F.3d 976, 981 (7th Cir. 2013). "[A]n administrator's decision will be upheld 'as long as (1) it

---

[6] Relatedly, the Court will not address Central States' assertion that Wingra waived the right to frame the dispute as a contractual one based on the 2017 settlement agreement. (Dkt. 53 at 9–10).

is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Tompkins v. Central Laborers' Pension Fund*, 712 F.3d 995, 999–1000 (7th Cir. 2013) (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)).

Courts assessing whether an administrator acted arbitrarily are limited to considering "the evidence that was before the administrator when it made its decision," the so-called administrative record. *Canter v. AT&T Umbrella Benefit Plan No. 3*, 33 F.4th 949, 957–58 (7th Cir. 2022). Importantly, this motion is one to compel discovery, so the question is not whether the information sought *is* part of the administrative record but whether it *could* conceivably be. *See Oppenheimer Fund*, 437 U.S. at 351; *Akridge*, 1 F.4th at 1276. With that in mind, Wingra seeks relevant information. Records related to witness interviews, internal emails between employees, and communications between key actors may have informed the trustees' decision-making or might reveal additional considerations that were part of the administrative record. Likewise, the pension plan's audit files naturally relate to the administrative record because the trustees expelled Wingra in part based on the results of these audits. And a privilege log is a common part of discovery that, in fact, protects Central States by aiding them in classifying information as privileged.

Wingra is also entitled to its discovery requests for an alternative reason. Courts can consider evidence beyond the administrative record in "special circumstances such as fraud or bad faith." *Semien v. Life Ins. Co. of North Am.*, 436 F.3d 805, 812 (7th Cir. 2006). "Where a claimant makes specific factual allegations of misconduct or bias in a plan administrator's review procedures, limited discovery is appropriate." *Id.* at 815. Two factors can give rise to the necessary

factual allegations: a conflict of interest or instance of misconduct, or a "prima facie showing that there is good cause to believe limited discovery will reveal a procedural defect in the plan administrator's determination." *Id.*

Wingra has not identified a conflict of interest but has successfully alleged potential bad faith by Central States. The counterclaim begins its factual background by claiming the action "arises out of Central States' *scheme* to terminate Wingra from the Pension Fund and gain millions of dollars in withdrawal liability." (Dkt. 19 ¶ 20). Wingra faithfully abided by the Settlement Agreement between the two parties. (*Id.* ¶ 26). Nonetheless, Central States terminated Wingra's fund participation based on meritless justifications. (*Id.* ¶¶ 29–30). The actual reason for the termination, Wingra alleges, was that Central States stood to gain significantly more money by expelling Wingra before January 1, 2021, an estimated liability of over $58 million. (*Id.* ¶ 41). Years after the Settlement Agreement, Central States removed Wingra on September 18, 2020, only months before the critical date, and the fund then promptly asked for over $58 million two weeks later. (*Id.* ¶ 42). Wingra may fall short of proving a "scheme" at this stage, but these allegations together provide enough factual support to warrant limited discovery into the fund's decision-making. The four main discovery requests appear carefully tailored to the relevant years, 2017 to 2020; the relevant actors, Central States and other union employees; the relevant documents, communications and audit files; and the relevant subject matter, Wingra's expulsion. As such, Wingra has justified its discovery requests.

## <u>CONCLUSION</u>

For these reasons, the Court grants Defendants/Counter-plaintiffs' Motion to Compel Discovery and extends fact discovery to June 30, 2023. (Dkt. 44). Central States' motion to strike is denied as moot. (Dkt. 55).

Virginia M. Kendall
United States District Judge

Date: January 17, 2023